# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

_____

BRIGITTE MARIE WASHINGTON,

                Plaintiff,

     v.                                      Case No. 09-CV-472

MICHAEL J. ASTRUE,
Commissioner of Social Security,

                Defendant.

_____

## ORDER

Plaintiff Brigitte Marie Washington ("Washington") filed this action for judicial review of the final decision of the Commissioner of Social Security denying her application for Disability Insurance Benefits and Supplemental Security Income. Washington alleges disability arising from a variety of causes, including: asthma, chronic obstructive pulmonary disease (COPD), herniated discs, osteoarthritis, fibromyalgia, migraines, depression, obesity, and chronic pain. For the reasons set forth below, the court finds that the decision of the Commissioner is supported by substantial evidence and will affirm the decision.

## BACKGROUND

### I.    Procedural Background

Washington initially filed for benefits on December 18, 2003, and alleged a disability onset date of November 22, 2003. (Tr. 78-80, 385-87). The Commissioner denied her initial application and also denied it upon reconsideration. (Tr. 65-68, 71-74). Washington requested a hearing and appeared before Administrative Law

Judge (ALJ) Lauren Mathon on October 24, 2006. (Tr. 613-57). The ALJ denied Washington's application in a decision issued on November 17, 2006. (Tr. 402-04). Washington then requested a review of the decision by the Appeals Council. (Tr. 415). While the decision was awaiting review, Washington filed a subsequent application for Supplemental Security Income and Disability Insurance Benefits. The Disability Determination Services processed the application and found Washington disabled as of June 7, 2004. (Tr. 392). Because this finding conflicted with ALJ Mathon's decision, the Appeals Council granted Washington's request for review of the decision and also reopened the State Agency's determination. The Appeals Council then set aside ALJ Mathon's decision, combined both claims, and remanded them to a second ALJ for a new decision. (Tr. 392-97). Washington appeared before ALJ Margaret O'Grady on May 8, 2008. (Tr. 658-703). The ALJ denied Washington's applications for benefits in a written decision issued October 3, 2008. (Tr. 15-36). The Appeals Council denied review and Washington filed suit in this court on March 6, 2009. (Tr. 7-9).

## II.    Factual Background and Hearing Testimony

Washington was 48 years old at the time of her hearing before ALJ O'Grady in 2008. (Tr. 83, 660). She completed high school and also completed an associate's degree in medical assisting. (Tr. 126, 662-63). Washington had previous work experience as a supervisor at an insurance company, a medicaid advocate, a customer service representative at a call center, a claims processor, a financial

employment planner for a welfare agency, and a case manager for a homeless shelter. (Tr. 106-13). However, Washington has not worked for several years and her most recent employment was in November 2003. (Tr. 663).

Washington also testified regarding her poor health and physical limitations during the hearing before the ALJ. Washington stated that she was on the following medications: Prevacid, Xopenex, Avair, Ultram, Spiriva, Proventil, Lithium, Lamictal, Abilify, Buspar, Topomax, Seroquel, and Cimbacort. (Tr. 665-66). Washington noted that she experiences side effects from her medication, such as tremors, flu-like symptoms, drowsiness, and lethargy, and claims that certain medications will put her to sleep for several hours at a time. (Tr. 667). Washington asserted a limited range of motion in her neck, constant head and neck pain, as well as muscle aches throughout her body. (Tr. 667-68). She further testified to constant health issues, ranging from a persistent cough to worsening of her fibromyalgia to a herniated disk flare up. (Tr. 672). Washington stated that she has difficulty sitting for long periods without pain and difficulty in crowded environments or environments with aromas, perfumes, or dust. (Id.). The weather also adversely affects her health by causing an increase in asthma attacks. (Tr. 678). Washington estimated that she could only sit for 30 minutes and that she could walk approximately one block. (Tr. 675). She suffers from arthritis in her right hand, which causes difficulty in moving and bending certain fingers and in holding, lifting, and typing. (Tr. 679-80)

Washington further testified that she had some thoughts of suicide after she stopped working in 2003 and after the Appeals Council remanded her disability determination. (Tr. 677). She suffers from migraine headaches twice a month and experiences stress arising from assistance she provides to her mother. (Tr. 681, 683-84). Washington also verified that she stopped regularly taking her prescriptions in 2005 and 2007 because she felt depressed and felt that there was no point in taking so much medication. (Tr. 671).

Washington also provided testimony regarding her activity levels. Washington informed the ALJ that she remains in her home the majority of the time and rarely gets dressed unless she has a doctor's appointment. (Tr. 668-69). However, she is able to drive and completes light grocery shopping and occasionally goes out to eat with her mother. (Tr. 669-70). She engages in limited household chores, such as light cooking, dishes and laundry and also assists her mother (who suffers from dementia) with her finances, medications, and doctors appointments. (Tr. 668-70). Washington reports spending most of her time watching television. She tried water aerobics, which helped her conditions, but stopped attending sessions over the winter. (Tr. 669).

A Vocational Expert, Robert Verkins ("Verkins"), provided testimony at Washington's hearing before ALJ O'Grady. The ALJ presented Verkins with several hypothetical individuals who had specific physical and mental limitations and asked Verkins if any jobs existed that the hypothetical individual could perform. Verkins

noted that Washington's former jobs could not be performed by a person who is limited to medium level work with no exposure to fumes, dust, environmental irritants and only occasional climbing, stooping, kneeling, crawling, balancing and crouching, as well as being limited to routine, repetitive, simple, non-complex, low stress work. (Tr. 692). However, Verkins verified that a significant number of other jobs exist in the state which a person with the aforementioned limitations could perform. He noted that 11,000 assembly jobs, 450 production inspector jobs, and 1,500 hand packer jobs exist at the medium level of work; 11,000 assembly jobs, 2,200 production inspector jobs, and 3,500 hand packer jobs exist at the light level of work; and that 900 bench work assembly jobs, 410 production inspector jobs, and 1,000 hand packer jobs exist at the sedentary level of work. Verkins also testified that an individual with the limitations noted above, who also needed to alternate between sitting and standing, could still perform approximately 5% of the light unskilled jobs he previously identified and all of the sedentary jobs he identified. (Tr. 692-93). However, if the hypothetical worker could only use her hands on a frequent but not constant basis, the available jobs would be limited to the inspector positions. (Tr. 693). Verkins also responded that four absences from work per month would not be acceptable in any competitive employment. He further verified that no job would accommodate an individual who needed to sleep for one to two hours after taking medications. (Tr. 696-97).

### III.    Medical Evidence of Record

Washington's relevant medical history begins with an MRI conducted on her cervical spine in 1997, which revealed focal disc herniation at the C4-5 level. (Tr. 526).  Her medical history then skips to February 2003, when she visited Dr. Enid Trotman for neck and back pain, upper respiratory infection, and increased anxiety. (Tr. 241).  In March 2003, Washington was hospitalized for severe abdominal pain, but the balance of her physical examination was normal and her lungs were "clear." (Tr. 214-16).  Washington visited Dr. C.R. Raj eight months later and complained about exacerbation of her chronic obstructive pulmonary disease.  Dr. Raj found an odor of tobacco about Washington, diagnosed chronic tobacco use, and advised her to stop smoking. (Tr. 229-30).  Washington was then examined by Dr. Daryl Melzer on behalf of the state agency in February 2004.  Dr. Melzer noted that Washington had previously been hospitalized and had a history of asthma, cervical disc with decreased range of motion of the neck, and that she had tenderness and chest pain. (Tr. 210-12).  In March 2004, Washington returned to see Dr. Trotman and was assessed as having cervical strain and severe back pain. (Tr. 185).

A Physical Residual Functional Capacity (RFC) Assessment of Washington was conducted by state agency physicians in March 2004 and reviewed in June 2004.  The RFC concluded that Washington had minor exertional limitations, including the ability to lift 20 pounds occasionally and 10 pounds frequently, and the ability to stand or sit for 6 hours of an 8 hour workday.  The RFC Assessment did not

note any postural, manipulative, visual, communicative or environmental limitations. (Tr. 174-80). Washington also submitted to a state agency mental status evaluation in June 2004, conducted by Dr. Darrell Hischke, Ph.D. Dr. Hischke diagnosed adjustment disorder with depressed mood, but noted only mild limitations in ability to sustain concentration, in persistence and pace, or in ability to cope with routine work stress and adapt to changes. He also assigned a Global Assessment of Functioning[1] (GAF) score of 70. (Tr. 205-09).

Washington visited psychiatrist Dr. Steven Ortell at Healthcare for the Homeless in October 2004. She reported panic attacks and informed him that she had an inpatient psychiatric hospitalization several months earlier. (Tr. 156-58, 288-90). Dr. Ortell stated that Washington was "a good candidate for vocational rehabilitation once things stabilize for her." (Tr. 157). He noted that Washington exhibited panic and major depression and assessed a GAF score of 40. (Tr. 290). Washington returned to see Dr. Ortell in March and May of 2005 and he added Buspar and Lithium carbonate to Washington's medications. (Tr. 278, 282). Shortly thereafter, on May 16, 2005, Dr. Ortell completed a form entitled Medical Opinion Re: Ability to Do Work-Related Activities (Mental) about Washington's condition and abilities. In this document, Dr. Ortell rated Washington's mental abilities and

---

[1]The Global Assessment of Functioning (GAF) is a scale for reporting a clinician's judgment of an individual's overall level of functioning. A score of 61 to 70 indicates some mild symptoms or some difficulty in social, occupational, or school functioning, but reveals that an individual is generally functioning pretty well, and has some meaningful interpersonal relationships. *Diagnostic & Statistical Manual of Mental Disorders* 32-34 (4th ed., Text Revision 2000).

aptitudes for work as either "good" or "fair" in every category of evaluation. (Tr. 345-47). Dr. Ortell also check-marked a box indicating that he anticipated Washington's impairments or treatment would cause her to be absent from work "more than four days per month." (Tr. 348).

In August 2005, Washington met with Lynn Hansen, a psychotherapist at Healthcare for the Homeless. Washington came up with a list of self-management goals that included walking in the park and visiting her son. Additionally, Ms. Hansen assigned Washington the task of determining how much it would cost to hire others to provide the services that Washington was currently providing to her mother, including: housekeeping, bookkeeping, and managing her mother's rental properties. (Tr. 267-68).

Washington returned to visit Dr. Ortell a year later, in June and July 2006. She reported experiencing good and bad days and Dr. Ortell started Washington on Zoloft. (Tr. 343, 356). Washington informed Dr. Ortell in July that the Zoloft made her more psychotic and disorganized, but reported in September that the medications were "working very well." (Tr. 355, 357).

Washington's physical condition was again addressed by medical professionals in February 2006, when she presented to the Emergency Department at St. Mary's Hospital and was diagnosed with abdominal pain. She was instructed regarding dietary changes and given a prescription for Pepcid. As part of the history

taken on Washington, she reported smoking 15 to 20 cigarettes per day. (Tr. 369-70).

Washington was also assessed by Dr. Trotman in October 2006. Dr. Trotman noted that Washington experienced exacerbation of her asthma and that she was a cigarette smoker. (Tr. 366). Dr. Trotman completed a Medical Examination and Capacity Form on Washington's behalf in November 2006. Dr. Trotman included diagnoses for asthma, cervical spine pain with cervical radiculopathy, chronic pain, and depression. (Tr. 490). The form provided categories of evaluation for physical capacities, including the ability to lift, carry, stand, walk and sit. (Id.). However, rather than evaluating Washington's specific abilities, Dr. Trotman merely wrote in the statement "patient is medically disabled and unable to work." (Id.). Dr. Trotman wrote the same statement in response to a question regarding Washington's ability to use her hands, communicate, and see. (Tr. 491). The form also included categories for evaluating Washington's mental health. Dr. Trotman marked this section of the form with "N/A." (Id.). Finally, in response to a question regarding the number of hours per day Washington could participate in work, Dr. Trotman wrote in the number "0." (Id.).

Washington began receiving medical insurance in March 2007 and was examined by rheumatologist Dr. John Albert. (Tr. 511, 516-18). Dr. Albert opined that Washington's symptoms were consistent with fibromyalgia, but he did not find any evidence for inflammatory arthritis or connective tissue disease. (Tr. 516-17).

Dr. Albert advised Washington to get aerobic exercise and to volunteer in order to "stop focusing on her pain so much." (Tr. 517). Washington also reported to Dr. Albert that she smoked ten cigarettes per day. (Tr. 516). Dr. Albert examined Washington again in April 2007 for polyarthritis of her hands and wrists. Dr. Albert found that she had mild to moderate osteoarthritis in the DIP and PIP joints (fingertip and mid-finger joints) and severe osteoarthritis in the right fifth DIP joint (fingertip joint of the little finger). (Tr. 518).

Washington saw therapist S.C. Henderson in May 2007 and admitted that she had not always been truthful in her symptoms sharing in the past. (Tr. 537). Washington also visited Dr. Lubsey in July and August 2007 to address her physical symptoms of migraine headaches, fibromyalgia, asthma and other disorders, and was prescribed Ultracet. (Tr. 497-500). Washington then returned to Dr. Ortell's office in August 2007, when she reported doing well on her medications, and in November 2007, when she reported stopping her Wellbutrin and feeling depressed. (Tr. 521-22). Dr. Ortell started Washington on a prescription for Eskalith in response to her claims. (Id.). In January 2007, Washington informed Dr. Ortell that her medications were working fine, but that her mother's dementia was causing her stress. (Tr. 520).

More than a year later, in May 2008, Dr. Trotman examined Washington and completed additional Medical Examination forms on her behalf. The two examination forms were dated May 2, 2008, and May 15, 2008 – one completed shortly before

Washington's hearing and one completed shortly afterwards. The examination forms both recorded diagnoses of asthma, COPD, cervical spine pain, cervical radiculopathy, chronic pain, depression, and fibromyalgia. (Tr. 542, 551). Dr. Trotman stated on each form that: "Patient is medically and mentally disabled and unable to work." (Tr. 542, 552). On the first form, Dr. Trotman does not note any specific physical, cognitive, or mental health limitations and notes only that Washington's medications cause drowsiness. (Tr. 542-43). However, on the second "updated" form completed after Washington's hearing, Dr. Trotman states that Washington can do "no lifting or carrying," "no standing, limited walking," and "no sitting for more than one hour." (Tr. 551). Dr. Trotman also notes that Washington cannot do any pushing, pulling, using of controls, bending or stooping. (Tr. 552). However, Dr. Trotman's physical examination of Washington conducted on May 2, 2008, revealed only that she had "mild wheezes" in both lungs. (Tr. 548).

Dr. Ortell also completed a second Medical Opinion Re: Ability to Do Work-Related Activities (Mental) for Washington in May 2008. Dr. Ortell checked boxes for "Seriously limited, but not precluded" or "Unable to meet competitive standards" for every mental ability and aptitude category evaluated on the form. (Tr. 554-58). Dr. Ortell also noted that Washington would be absent from work more than four days per month. (Tr. 558).

**ANALYSIS**

The Social Security Act provides that a district court may affirm, modify, or reverse the decision of the Commissioner of Social Security and may also remand the cause for a rehearing. 42 U.S.C. § 405(g). However, the statute also states that "the findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). The court will uphold the Commissioner's decision if it is supported by substantial evidence and does not contain legal error. *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). Substantial evidence is evidence that a reasonable person would accept as adequate to support the decision. *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004); *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003). The court determines whether the decision is supported by substantial evidence by reviewing the entire record, but the court cannot substitute its judgment for the ALJ's by reconsidering facts, re-weighing evidence, resolving conflicts in evidence, or deciding questions of credibility. *Jens*, 347 F.3d at 212. Instead, the court looks to see whether the ALJ articulated an "accurate and logical bridge from the evidence to the conclusion" that the court can follow. *See Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000).

Washington asks the court to reverse the Commissioner's unfavorable decision and to remand her claim for further administrative proceedings. Washington argues that the ALJ committed legal error in her credibility determination, that the ALJ failed to build an accurate and logical bridge from the

evidence to her conclusion, and that the ALJ wrongly discounted the opinions of Washington's treating physician and psychiatrist.  Washington alleges that these errors require remand to the agency.

## I.    Credibility Determination

ALJ O'Grady determined that Washington had medically determinable impairments that could produce the symptoms she alleged, however, the ALJ also found Washington's statements about the intensity, persistence and limiting effects of the symptoms to be "not credible to the extent that they are inconsistent with the residual functional capacity assessment for the reasons explained below." (Tr. 30). Washington argues that this determination fails to comply with Social Security Ruling 96-7p or mandates by the Seventh Circuit Court of Appeals regarding necessary support for credibility findings.

An ALJ's credibility determinations are entitled to special deference and will not be disturbed unless "patently wrong." *Diaz v Chater*, 55 F.3d 300, 308 (7th Cir. 1995).  A district court's review of an ALJ's credibility determination is highly limited because the court "lacks direct access to the witnesses, lacks the trier's immersion in the case as a whole, and when reviewing decisions by specialized tribunals also lacks the trier's experience with the type of case under review." *Carradine v. Barnhart*, 360 F.3d 751, 753 (7th Cir. 2004).  When an ALJ evaluates the credibility of testimony and complaints, there are several factors to consider, including:  the absence of an objective medical basis supporting the degree of severity of subjective

complaints alleged; the claimant's daily activity; the duration, frequency, and intensity of pain; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions. *Scheck v. Barnhart*, 357 F.3d 697, 703 (7th Cir. 2004); *see also* SSR 96-7p. After evaluation of these factors, an ALJ may find a claimant's symptoms not credible even where there is a medically determinable impairment that could reasonably be expected to produce the symptoms the complainant alleges. *See Scheck*, 357 F.3d at 701-03 (7th Cir. 2004).

The ALJ's credibility determination is entitled to considerable deference and this court cannot determine that her assessment is patently wrong. The ALJ cites to the relevant factors in reaching her conclusion. First, the ALJ noted a lack of objective medical support for certain of Washington's symptoms. The ALJ states that Washington's depressive symptoms were under fairly good control when she was compliant with her prescriptions and that Dr. Trotman stated on Washington's November 2006 Medical Examination Form that mental health issues were "not applicable." The ALJ also cited the effectiveness of Washington's medications in decreasing head and neck pain and muscle aches, as reported by Washington herself. The ALJ further reasoned that Washington's reported functional limitations did not match up with some of her reported activities. For instance, Washington claimed that she could not engage in daily activities because of severe limitations on her ability to stand, walk, or go outside, but also reported that she went bowling with her son once a week. Further, Washington reported that she "cannot go out"

because of asthma, but one of the health goals Washington set for herself in therapy was "walking in the park."

The ALJ also noted inconsistencies in Washington's claims and medical records that undermine her general credibility as a witness. First, the ALJ documented Washington's vacillation between claims that she had quit smoking years ago and claims of current heavy smoking. Indeed, Washington reported in 2003 that she had quit smoking back in 2001. However, Dr. Raj diagnosed her as a chronic tobacco user in late 2003 and noted an "odor of tobacco" about her person. Further, Washington reported smoking a half a pack a day in December 2004 but alternatively suggested to Dr. Trotman one month later that she was a nonsmoker. Finally, Washington admitted to various medical treaters in 2006 and 2007 that she smoked "15 to 20" cigarettes per day, "10 cigarettes" daily, or a half a pack a day. The ALJ relied upon these reports to question Washington's credibility and also to undermine specific claims of increased breathing difficulties due to asthma.

The ALJ cited additional evidence of Washington's incredibility. ALJ O'Grady points out that around the time Washington was applying for disability based on asthma, she reported to Dr. Melzer that she had been hospitalized for breathing problems in 2003. However, in reality, Washington was hospitalized for abdominal pain and a physical examination found her lungs to be "clear." Finally, the ALJ noted

that Washington admitted to her therapist in 2007 that she had "not always been truthful in her symptoms sharing in the past."

The ALJ supported her credibility finding by citing to relevant evidence in the record and adequately articulated her reasoning. This court must apply a high level of deference and cannot itself decide questions of credibility. The ALJ did not commit any errors of law and she provided evidence that a reasonable person would accept as adequate to support her conclusion.

## II. Support for the Residual Functional Capacity

Washington next criticizes the ALJ's Residual Functional Capacity (RFC) assessment because the ALJ failed to properly evaluate her ability to engage in sustained work activity. Washington attacks the ALJ's reasoning process and asserts that "had the ALJ considered all relevant evidence, then she would have found Plaintiff disabled." (Pl.'s Br., at 14). This court disagrees.

An RFC is the maximum that a claimant is still capable of despite her mental and physical limitations. *Craft v. Astrue*, 539 F.3d 668, 676 (7th Cir. 2008) (citing 20 C.F.R. § 404.1545(a)(1); SSR 96-8p). The ALJ determined that Washington had the RFC to perform light work that involves lifting up to 20 pounds occasionally and 10 pounds frequently, and standing/walking about six hours and sitting two hours of an eight-hour workday, with normal breaks. The RFC also included the additional restrictions of occasional stooping and crouching, avoidance of all fumes and other environmental irritants, and avoidance of extremes of heat and cold. Finally, the

RFC limited Washington to simple, routine work to account for any mental functioning limitations.

Washington initially criticizes the ALJ's finding because the ALJ cited to the opinion of the Administrative Appeals Judge who remanded the case to the ALJ. Washington argues that the Appeals Judge is not a physician and that RFC assessments must be based solely on the evidence of record. However, ALJ O'Grady's decision determining that Washington has moderate limitations in activities of daily living, social functioning, and in concentration, persistence or pace are not based on the statements of the Administrative Appeals Judge. Instead, the ALJ supports each of her individual findings with evidence contained in the record. First, the ALJ concluded that Washington suffered only moderate daily living limitations. She based the finding on Washington's ability to serve as a caregiver for her mother, to manage her mother's bookkeeping and rental properties, to do light household chores and shopping, as well as her ability to drive. Second, the ALJ concluded that Washington suffered only moderate social functioning limitations. She supported this determination by referencing Washington's management of her mother's rental properties; a task that involves "people skills." The ALJ further supported her finding by noting that Washington visited her boyfriend several times per week, visited her son once per week, interacted well with others in her therapy group, and occasionally went out to eat. Third, the ALJ based her conclusion that Washington has moderate limitations in concentration, persistence or pace on the

findings of Dr. Hischke, on Dr. Ortell's original determinations in 2005, on Washington's significant improvement when compliant with medications, and on Washington's ability to balance a checkbook, pay bills, and keep track of her mother's medications and doctors appointments.

The ALJ provides a paragraph of explanation for each of her aforementioned conclusions. Only after spelling out the evidentiary basis for her findings does the ALJ note: "[t]he opinion that the claimant has no more than moderate limitations and that the claimant's depressive symptoms were under fairly good control is consistent with the opinion of the Administrative Appeals Judge."[2] (Tr. 28). ALJ O'Grady's comment does not mean she abdicated her responsibility to independently weigh the evidence. Instead, the comment merely points out the consistency between the conclusion of the ALJ and that of the Appeals Council. This court cannot find fault with the RFC assessment because of such an innocuous reference.

Washington next argues that the ALJ ignored evidence that contradicted her findings. Washington asserts that the ALJ failed to account for Washington's testimony regarding her physical limitations, such as pain, migraine headaches,

---

[2]The ALJ also referenced the Appeals Court Order at another point in her opinion, stating: "As indicated in the AC Order, from a physical standpoint, the Administrative Appeals Judge determined that the evidence of record did not establish a level of severity which could preclude all substantial gainful activity." (Tr. 32). However, Washington does not cite to this comment as constituting error. Instead, Washington cites only to page 28 of the transcript, which contains the passage the court quoted in the body of the order. Further, even considering the second statement, the court's conclusion remains the same. The ALJ's comment does not indicate that the she failed to engage in an independent evaluation. Indeed, after making the comment, the ALJ proceeds to articulate her own reasoning by assessing the evidence of record. (Tr. 32-34). The ALJ did not rely on the decision of the Administrative Appeals Court in lieu of engaging in her own analysis and reference to the Appeals Court opinion does not constitute remandable error.

fibromyalgia, and herniated disc flare-ups.   Washington also asserts that the ALJ failed to account for her mental conditions, including bipolar disorder, anxiety and depression.   However, the ALJ included each of the aforementioned conditions in her finding of severe impairments.  The ALJ also made an extremely detailed review of all the medical evidence of record, which she laid out over eight pages. (Tr. 18-26).  Further, at the outset of the ALJ's analysis of Washington's RFC, she notes all of the limitations Washington claimed in her various disability reports, applications, and hearings, and specifically cites severe back pain, depression, and fibromyalgia. (Tr. 30).   Thus, the court cannot determine that the ALJ ignored the conditions in rendering an RFC determination.

Washington next makes a single-sentence argument that the RFC assessment is inadequate because the ALJ failed to explain which medical evidence specifically supports her assessment.  Washington makes this assertion despite the ALJ's detailed recitation of all medical evidence earlier in the decision and the significant evidentiary support the ALJ provided for her findings that Washington was moderately limited in daily living, in social functioning, and in concentration, persistence and pace.  Even if this court limits its consideration to the portion of the opinion immediately following the RFC finding, the court still finds that ALJ O'Grady provided specific medical evidence in support of her RFC assessment.  The ALJ cites to Dr. Trotman's initial capacity assessment reporting that Washington had no mental health issues that would cause work-related limitations. (Tr. 30).  The ALJ

also relies on Dr. Ortell's conclusion that Washington had a good ability to understand, remember, and carry out simple and detailed instructions and a fair ability to maintain attention for a two-hour segment. (Tr. 33). She next cites to Dr. Ortell's determination that Washington had a fair ability to maintain regular attendance and be punctual and to complete a normal workday and workweek without interruption from psychologically based symptoms. (Tr. 33). The ALJ further notes a lack of objective evidence regarding Washington's limitations on the use of her hands. The rheumatologist who examined Washington's hands did not limit her functioning and his examination demonstrated full strength in the hands and fingers. (Tr. 32, 34). Additionally, the ALJ cites other conclusions reached by Dr. Trotman and Dr. Ortell and explains why she discounts the particular evidence. (Tr. 33-34). ALJ O'Grady cited particular medical evidence in support of her RFC determination to allow the court to follow her reasoning.

Finally, Washington argues that the ALJ failed to properly consider the way Washington's impairments affect her ability to work a regular schedule. Social Security Regulation 96-8p defines an RFC assessment as the individual's ability to do work-related activities on a regular and continuing basis, meaning the ability to work the equivalent of 8 hours per day, 5 days per week. SSR 96-8p. Washington asserts that the ALJ failed to account for her testimony that she sometimes experiences "bad days" on which she must take pain medication and stay in bed most of the day and her testimony that migraines incapacitate her 1-2 times per

month.  However, the ALJ found that Washington's statements regarding the intensity, persistence and limiting effects of her symptoms were "not credible"; a finding the court cannot deem patently wrong.  Further, an ALJ "need not provide a complete written evaluation of every piece of testimony and evidence," particularly when the ALJ previously found that the claimant's reported limitations and complaints of pain not credible. *Diaz v. Chater*, 55 F.3d 300, 308 (7th Cir.  1995).  Consequently, the court finds that substantial evidence supports the RFC Assessment provided by the ALJ.

### III.    Opinions of Treating Physicians

Washington also argues that the ALJ committed an error of law in discounting certain conclusions reached by Dr. Ortell and Dr. Trotman.  The ALJ refused to credit Dr. Ortell's opinion that Washington's impairments would cause more than four absences from work per month.  The ALJ also refused to rely upon certain opinions given by Dr. Ortell and Dr. Trotman in their May 2008 evaluations.  Dr. Ortell completed an evaluation of Washington's mental abilities in May 2008 in which he checkmarked boxes indicating that Washington was either seriously limited or unable to meet competitive standards in all abilities and aptitudes. (Tr. 554-58).  Dr. Trotman completed two forms in early May 2008 regarding Washington's physical abilities and concluding that Washington is "medically and mentally disabled and unable to work." The forms also state that Washington cannot do any lifting, carrying,

standing, sitting for more than one hour, pushing, pulling, bending, stooping, and can only engage in limited walking. (Tr. 542, 551-52).

However, contrary to Washington's assertions, the ALJ provided sufficient explanation for discounting these conclusions. The ALJ first rejected Dr. Ortell's determination that Washington's impairments would result in more than four absences from work per month. The ALJ notes that the finding is "conclusory" and that Dr. Ortell does not provide an explanation or medical basis for the finding. The ALJ's statement is illustrated by the context in which Dr. Ortell made his statement. In completing a "Medical Opinion Re: Ability to Do Work-Related Activities (Mental)" document in 2005, Dr. Ortell noted that Washington had either a "good" or "fair" ability to do all the aptitudes needed for unskilled, semiskilled, and skilled work. (Tr. 345-48). However, within the same form, he concludes that Washington's impairments will cause more than four absences from work a month, without any further explanation. (Tr. 348).

Additionally, the ALJ discounted Dr. Ortell's later determination that Washington is seriously limited or wholly unable to meet competitive standards in mental abilities and aptitudes for work because the conclusions are inconsistent with Dr. Ortell's treatment notes and with Washington's activities. ALJ O'Grady notes that Washington's reported ability to provide care for her mother, handle household bills, and manage her mother's medications and doctors appointments was inconsistent with the lack of memory or mental functioning found by Dr. Ortell.

Further, as the ALJ points out, Dr. Ortell's 2008 conclusions differ significantly from his earlier treatment notes and determinations that Washington "is a good candidate for vocational rehabilitation once things stabilize for her," that she improved considerably while on medications, and that she had a good ability to understand, remember, carry out instructions, and a fair ability to maintain attention for two hours, have regular work attendance, and work regular workdays and workweeks without significant interruption from psychological symptoms. (Tr. 157, 345-47). Such inconsistency is a legitimate basis for assigning reduced weight to a physician's conclusions. *See Johansen v. Barnhart*, 314 F.3d 283, 287 (7th Cir. 2002) (stating that a "treating physician's opinion is entitled to controlling weight only if it is not inconsistent with other substantial evidence in the record.").

Lack of support and inconsistency provides similar justification for the reduced weight the ALJ assigns to Dr. Trotman's May 2008 opinions. Dr. Trotman states that Washington is both "mentally disabled and unable to work," as well as "medically disabled and unable to work." However, as the ALJ notes, assessment of mental impairments does not appear to be within Dr. Trotman's area of expertise as a medical doctor. Further, a physician's statement that a claimant is "disabled" is not conclusive because determination of disability is reserved to the Commissioner of Social Security. *Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001); *Johansen*, 314 F.3d at 288.

Finally, Dr. Trotman's May 2, 2008 assessment of Washington's capacity and her May 15, 2008 "updated" assessment contradict one another. The earlier assessment gives a prognosis of "fair," provides no specific physical limitations on lifting, carrying, standing, or walking, and states that other capacity limits such as the need to alternate positions, or limits on pushing, pulling, operating controls, bending and stooping are "N/A." (Tr. 542-43). However, less than two weeks later, and after Washington appeared before the ALJ, Dr. Trotman revised her conclusions to state that Washington can engage in *no* lifting, carrying, standing, sitting for more than one hour, and that she is restricted to limited walking. (Tr. 551). Further, the revised form states that the above-mentioned capacity limits are "N/A," but states immediately afterwards that Washington is unable to push, pull, use controls, bend, or stoop. (Tr. 552). Dr. Trotman places increased limitations on Washington after her hearing before the agency, but provides no explanation for the changed opinions. Indeed, both Dr. Trotman's original conclusions and her "revised" conclusions are based upon the same May 2, 2008 physical examination. The court struggles to understand why Dr. Trotman revised her opinions when the evidence relied upon did not change and Dr. Trotman provides no insight into her reasoning. Thus, the ALJ understandably assigns decreased weight to Dr. Trotman's opinions because the opinions are inconsistent with each other and with other record evidence. *See Knight v. Chater*, 55 F.3d 309, 314 (7th Cir. 1995) ("Medical evidence

may be discounted if it is internally inconsistent or inconsistent with other evidence.").

As a final matter, Washington takes umbrage at the ALJ's statement that Washington obtained Dr. Trotman's May 2008 opinions in anticipation of her upcoming benefits hearing before the ALJ. The ALJ stated in her opinion: "Although such evidence is certainly legitimate and deserves due consideration, the context in which it was produced cannot be entirely ignored." (Tr. 32). The Seventh Circuit suggests that an ALJ may not discount a physician's views based upon speculation that the physician was attempting to assist a claimant in her efforts to obtain disability benefits. *See Moss v. Astrue*, 555 F.3d 556, 560-61 (7th Cir. 2009). However, the ALJ cites a number of reasons for discounting Dr. Trotman's opinions that are unrelated to any attorney referral for the purpose of generating favorable evidence. Further, the ALJ explicitly states that evidence obtained from a physician to support an application for disability benefits is legitimate and deserving of consideration. The ALJ did not err by mentioning the context in which Washington obtained evidence from Dr. Trotman. Indeed, the ALJ could not help but notice that Dr. Trotman provided her initial opinion six days before Washington's hearing and then provided the "updated" opinion one week after Washington's hearing but prior to issuance of a decision. The court finds no error of law in the ALJ's treatment of medical opinions included in the record.

Accordingly,

**IT IS ORDERED** that the decision of the Commissioner denying the plaintiff's application for disability insurance benefits and supplemental security income be and the same is hereby **AFFIRMED**; and

**IT IS FURTHER ORDERED** that this case be and the same is hereby **DISMISSED**.

The clerk of court is ordered to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 19th day of August, 2010.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge